DMOT

IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY MARYLAND

JOSEPH HOOKER
1009 Trebing Lane
Largo, Maryland 20774

    Plaintiff,

v.

Case No. CAU5-00716

COMENITY LLC
Serve: CT Corporation System
    1300 East Ninth Street
    Cleveland, Ohio 44114

    Defendant,

ASSET ACCCEPTANCE, LLC
Serve: CSC-Lawyers Incorporating Service Company
    7 Saint Paul Street, Suite 820
    Baltimore, Maryland 21202

    Defendant,

EQUIFAX INFORMATION SERVICES, LLC
Serve: CSC-Lawyers Incorporating Service Company
    7 Saint Paul Street, Suite 820
    Baltimore, Maryland 21202

    Defendant,

EXPERIAN INFORMATION SOLUTIONS, INC.
Serve: The Corporation Trust Incorporated
    351 West Camden Street
    Baltimore, Maryland 21201

    Defendant,

TRANSUNION, LLC
Serve: CSC-Lawyers Incorporating Service Company
    7 Saint Paul Street, Suite 820
    Baltimore, Maryland 21202

    Defendant.

PR GEO CO MD #84   2015 JAN 30 PM 2:35   Clerk of the Circuit Court

Case: CAL15-00716
NEW CASE/PRO SE
CV CLERK FEE-           80.00
MD LEGAL SERV           55.00
TOTAL                  135.00
Rest PG20    Rcpt # 16921
SJH    OCT    Blk # 18
Feb 03, 2015           01:49 PM

1

## COMPLAINT - CLASS ACTION & JURY DEMAND

This is an action for a consumer seeking actual, statutory and punitive damages, costs and attorney's fees brought pursuant to 15 U.S.C. § 1692 et seq. (Fair Debt Collection Practices Act or "FDCPA"), 15 U.S.C. § 1681 et seq. (Fair Credit Reporting Act or "FCRA"), Md. Code Ann., Com. Law §14-101 et seq. (Maryland Consumer Debt Collection Act or "MCDCA") and Md. Code Ann., Com. Law §13-101 et seq. (Maryland Consumer Protection Act or "MCPA").

### PARTIES

1. Plaintiff Joseph Hooker is a resident of Largo, Maryland.

2. Asset Acceptance, LLC ("AALLC") is a limited liability company with its principal place of business in Warren, Michigan and is licensed as a collection agency with the state of Maryland.

3. At all relevant times, Asset Acceptance – in the ordinary course of its business – regularly engaged in the practice of collecting debts originally owed to other entities, using the mails and telephone system for that purpose and is a "debt collector" under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692a(6).

4. Comenity LLC or Comenity Bank ("Comenity") issues credit cards for many top brand clothing designers, including Chadwick's, MetroStyle and Roamans.

5. Defendant Equifax Information Services, LLC ("Equifax") is a credit reporting agency that operates throughout the United States, including the state of Maryland.

6. Defendant Experian Information Solutions, Inc. ("Experian") is a credit reporting agency that operates throughout the United States, including the state of Maryland.

7. Defendant Trans Union, LLC ("Trans Union") is a credit reporting agency that operates throughout the United States, including the state of Maryland.

## FACTUAL ALLEGATIONS

8. In the year of 2007 Mr. Hooker was the victim of identity theft. Some person -- believed to be his ex-wife -- fraudulently opened several retail credit card accounts in his name.

9. Upon information and belief Mr. Hooker's ex-spouse fraudulently used his identity to open a Chadwick's, MetroStyle, Roamans and Midnight Velvet credit card accounts.

10. Mr. Hooker notified each of the foregoing retailers of the fraudulent origination of the retail credit card accounts in his name.

11. The Chadwick's, MetroStyle and Roamans retail credit card accounts were issued by Comenity Bank and each retailer sells women's clothing. Upon information and belief the credit cards were used to purchase women's clothing for personal, family or household purposes.

12. On August 28, 2008 Comenity was apprised by Mr. Hooker that the credit card accounts were fraudulently opened in his name and Comenity subsequently closed each account that very same date.[1]

13. Despite being on notice of the fraudulent nature of the accounts, Comenity sold the accounts to Asset Acceptance in July and August 2010.

14. Comenity's representatives, Cortez and Emily, advised Mr. Hooker that Comenity sent all information and documentation regarding the accounts to AALLC.

15. Upon information and belief, AALLC received Comenity's notes reflecting that the accounts were closed due to fraudulent origination when AALLC acquired the accounts.

---

[1] On January 21st 2015 at 9:53-9:59am Mr. Hooker spoke with a Comenity Bank representative, Cortez, who advised Mr. Hooker that Comenity Bank closed the accounts on August 28, 2008 after receiving his identity theft complaint that very same date.

3

16. Soon after AALLC acquired the accounts it sent Mr. Hooker dunning letters seeking to collect on the fraudulent accounts.

17. After receiving AALLC's dunning letters Mr. Hooker contacted both Comenity and AALLC to inform and remind them that the accounts were fraudulently opened in his name.

18. Comenity and/or AALLC instructed Mr. Hooker to complete an identity theft victim report with his local police agency and to send that report to both AALLC and Comenity.

19. On December 27, 2010 Mr. Hooker caused a police incident report to be created that stated Mr. Hooker was a victim of identity theft. Specifically, the report stated that Mr. Hooker's "ex-wife opened up various accounts using his name."

20. Upon receipt of Mr. Hooker's police report AALLC advised Mr. Hooker that the report was insufficient because it did not specifically identify the accounts that were fraudulently originated in his name.

21. Soon thereafter, Mr. Hooker revisited the police station and had the police officer supplement the report by adding the specific following accounts to the report: Chadwick (Acct #13208), Metro Style (Acct #57116), Roamans (Acct #17126) and Midnight Velvet (Acct #71345926).

22. Mr. Hooker immediately sent Comenity and AALLC the report with the updated information ("updated report") specifically identifying the Comenity accounts as being fraudulently opened.

23. Both AALLC and Comenity continued to attempt to collect the debt and/or report the debt to the credit reporting agencies after receiving the updated report.

24. In September, November and December of 2014 AALLC sent dunning letters stating that Chadwick's balance was $1382.49, $1392.49 and $1396.74, respectively.

25. AALLC claims to have purchased the Chadwick account on August 18, 2010.[2]

26. AALLC claims that the date of delinquency was August 28, 2008.

27. Under federal banking regulations, a credit card debt **must** be charged off when it is 180 days overdue (it may be charged off earlier). Federal Financial Institutions Examination Council, Uniform Retail Credit Classification and Account Management Policy, 65 FR 36903 (June 12, 2000).

28. Charge-off means that the credit card receivable is no longer carried on a bank's books as an asset.

29. In Mr. Hooker's case, the accounts were required to be charged off not more than 180 days after August 28, 2008, or by March 2009.

30. AALLC claimed that the amount charged off was $1,053.44 with $922.30 attributed to principal and $131.14 due from interest.

31. AALLC demanded $353.91 in interest as of January 26, 2015, computed at a rate of 6% per annum.

32. At 6%, interest on $922.30 is $55.33 per annum or $.15 per diem.

33. The $353.91 interest therefore amounted to 6.39 years' or 77.3 months' worth of interest, and included interest prior to the date on which AALLC claims to have purchased the debt.

34. 6.39 years or 77.3 months from January 26, 2015 dates back to August 28, 2008.

35. Comenity was still charging interest on the account from August 28th 2008 to March 5th 2009, so AALLC is assessing an additional 6% interest to the accounts for that time period.

---

[2] AALLC also claims to have purchased the Roaman's and MetroStyle accounts in July & August 2010.

5

36. AALLC knows that the $1,053.44 charge-off balance as of March 5, 2009 included $131.14 of interest. Despite knowing that interest was already assessed from August 28, 2008 to March 5, 2009, AALLC is charging interest on the account for the same time period.

37. AALLC knows that Comenity stopped charging interest after the accounts were charged-off in March 2009. Despite knowing that Comenity waived its right to collect interest from March 5, 2009 to August 18, 2010, AALLC is charging interest on the accounts for that time period.

## POLICIES AND PRACTICES OF AALLC

### Interest After Charge-off

38. It is the policy and practice of AALLC to add interest to debts for the period prior to the date on which AALLC claims to have purchased the debt, if the prior owner of the debt did not add interest during that period.

39. The bank from which AALLC allegedly purchased the debt did not charge interest after the charge-off.

40. Most of the debts which defendant seeks to collect are credit cards originally issued by banks.

41. The standard form credit card agreements used by banks provide that the banks may change the terms of the agreement from time to time, and that changes beneficial to the consumer such as a reduction in or waiver of interest may be effected immediately and without notice.

42. As a standard practice, and for a variety of sound business reasons, most banks waive interest on credit card debts after charge-off for as long as the debts are held by the banks.

6

43. Among other reasons for this practice, banks are now required to send periodic statements on all accounts, including defaulted accounts, for any period during which interest or fees are added to the account. Regulation Z, 12 C.F.R. §226.5(b)(2)(i) ("A periodic statement need not be sent for an account if the creditor deems it uncollectible, if delinquency collection proceedings have been instituted, [or] if the creditor has charged off the account in accordance with loan-loss provisions and will not charge any additional fees or interest on the account...."). Banks generally prefer to waive the interest and save the expense of preparing and sending statements.

44. AALLC only took what the assignor could give. If the assignor waived the right to add interest post-charge-off, AALLC acquired the debt (if at all) subject to that waiver.

45. AALLC often purchases, or claims to purchase, credit card debts from banks months, or years, after the bank has charged off the debts.

46. AALLC sends dunning letters to consumers that state the balance is an amount that reflects principal plus interest, including interest during the period between the debt charge-off and AALLC's acquisition of the debt.

47. AALLC's dunning letters are representations that AALLC has the right to add interest for the period between charge-off and purchase.

### Interest On Top Of Interest

48. It is the policy and practice of AALLC to add interest to debts for the period between the default and the charge-off, despite that the original creditor is still charging interest during this same time period.

49. The original creditor still owns the debt after the default and prior to the charge-off and does not charge the additional interest that AALLC is assessing on the debts.

50. AALLC sends dunning letters to consumers that state the balance is an amount that reflects principal plus interest, including interest assessed by AALLC in addition to the original creditor's contractual interest rate during the period between the debt default and the debt charge-off.

51. AALLC's dunning letters are representations that AALLC has the right to increase the contractual interest rate for the period between the debt default and charge-off.

### COUNT I: FDCPA 15 U.S.C. §1692 CLASS CLAIM

52. Plaintiffs incorporate paragraphs 1-51 by reference.

53. AALLC violated 15 U.S.C. §§1692e, 1692e(2), 1692e(10), 1692f, and 1692f(1), with respect to plaintiff and each other person who had interest added by AALLC to the claimed amount of their alleged debts, that had not been added by the alleged owner of the debt at the time.

54. AALLC violated 15 U.S.C. §§1692e, 1692e(2), 1692e(10), 1692f, and 1692f(1), with respect to plaintiff and each other person who had interest added by AALLC to the claimed amount of their alleged debts, that had already been charged interest by the alleged owner of the debt at the time.

55. Further, AALLC engaged in a deceptive collection practice (contrary to 15 U.S.C. §1692e) and an unfair debt collection practice (contrary to 15 U.S.C. §1692f), for adding unauthorized interest to alleged debts, including the alleged debt of plaintiff.

56. 15 U.S.C. §1692e provides that

> **A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section....**
>
> (2) The false representation of –

8

    (A) the character, amount, or legal status of any debt....

  (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer....

57. 15 U.S.C. §1692f provides that

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section....

  (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law....

Class Allegations

58. Plaintiffs bring this action for himself and on behalf of the class, pursuant to Maryland Rule 2-231(a)&(b)(3).

59. The class consists of (a) all individuals (b) from whom AALLC attempted to collect a credit card debt, (c) who had interest added by AALLC to the claimed amount of the alleged debt.

60. The 1st subclass consists of (a) each member of the class in paragraph 59 (b) who was charged interest by AALLC (c) that had not been added by the alleged owner of the debt prior to purchase by AALLC, (d) at any time between a date one year prior to the filing of this action.

61. The 2nd subclass consists of (a) each member of the class in paragraph 59 (b) who was charged interest by AALLC (c) in addition to the interest being charged by the original creditor (d) during the time period between the debt default and charge-off, (e) at any time between a date one year prior to the filing of this action.

9

62. The members of the class are so numerous that joinder of all is not practicable.

63. On information and belief, there are at least 40 individuals within the defined class.

64. There are questions of law and fact common to the class members, which predominate over any questions relating to individual class members. The predominant common questions are:

    a. Whether defendant engages in a practice of adding interest to debts for periods prior to the purchase of debts that had not been added by the alleged owners of the debts at the time;

    b. Whether defendant engages in a practice of increasing the interest rate to debts during periods between the default and charge-off;

    c. Whether defendant has a standardized procedure for sending dunning letters demanding amounts including interest for periods prior to the purchase of debts that had not been added by the alleged owners of the debts at the time;

    d. Whether defendant has a standardized procedure for sending dunning letters demanding amounts including augmented interest rates for periods between the default and the charge-off prior; and

    e. Whether such practice violates the FDCPA.

65. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

66. Plaintiff will fairly and adequately represent the class members. Plaintiff will retain competent and experienced counsel.

67. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible;

    b. Members of the class are likely to be unaware of their rights; and

      c.      Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

## COUNT II: FDCPA 15 U.S.C. §1692 INDIVIDUAL CLAIM

68. Plaintiffs incorporate paragraphs 1 - 67 by reference.

69. On January 21st, 26th & 27th of 2015 Mr. Hooker contacted AALLC to request it cease attempting to collect on the fraudulently opened accounts.

70. AALLC stated that it performed an investigation of Mr. Hooker's claims and determined that Mr. Hooker was liable for the debts.

71. Mr. Hooker asked AALLC what information it had regarding the subject accounts and to send documentation, including the credit card application, that AALLC relied upon to determine that Mr. Hooker was liable on the debt.

72. AALLC advised Mr. Hooker that the only information it had was: the last payment date of July 2008, his name, his social security number, his address and the account balance.

73. AALLC further advised Mr. Hooker that his opportunity to request documentation was lost 30 days after he received the first letter from AALLC back in 2010.

74. Continuing, AALLC further announced that it no longer had any legal obligation to provide the documentation and inferred that he could no longer dispute that he was legally liable on the debt.

75. AALLC also advised Mr. Hooker that it would continue to report the debts to Trans Union, Experian and Equifax.

76. Defendant AALLC's violations of the FDCPA include, but are not limited to, the following:

11

  **(a)** AALLC violated 15 U.S.C. § 1692f(1) by, including but not limited to, attempting to collect interest on a debt that is neither authorized by agreement nor permitted by law by attempting to collect 6% interest per annum on the debt when AALLCC has no contract that obligates the Plaintiff to pay AALLC any amount, let alone principal plus interest;

  **(b)** AALLC violated 15 U.S.C. § 1692e(8) by threatening to report and/or actually reporting negative information to the CRAs while (i) knowing the Comenity accounts were fraudulently opened and (ii) knowing it did not have an application or any documents to support a legal position that Plaintiff was liable on the debt;

  **(c)** AALLC violated 15 U.S.C. § 1692e(10) by falsely representing that the Plaintiff could no longer dispute the debt because he failed to do so within 30 days of receiving AALLC's initial communication; and

  **(d)** AALLC violated 15 U.S.C. § 1692e by falsely representing that AALLC had sufficient information to hold Plaintiff liable on the debt when AALLC did not have the contract and only had the Plaintiff's name, address, social security number, date of last payment and the account balance.

  77. AALLC's FDCPA violations caused the Plaintiff to endure damages including heavy stress, headaches, stomach aches, sleepless nights, weigh instability, excessive worry, pecuniary expenses, mental and emotional distress.

  78. AALLC's conduct was the proximate cause of Plaintiff's injuries, rendering Defendant Rush liable for actual damages in an amount to be determined by the jury pursuant to

15 U.S.C. §1692k(a)(1), statutory damages pursuant to 15 U.S.C. §1692k(a)(2)(A), and reasonable attorney's fees pursuant to 15 U.S.C. §1692k(a)(3).

### COUNT III: MCDCA INDIVIDUAL CLAIM

79. Plaintiffs incorporate paragraphs 1 - 78 by reference.

80. AALLC knew Plaintiff was the victim of identity theft.

81. AALLC knew Plaintiff did not use the accounts.

82. AALLC knew it had no contract/application that was signed by the Plaintiff.

83. Therefore, AALLC knew it did not have a legitimate claim against the Plaintiff.

84. Despite knowing it had no legal right to collect a debt from Plaintiff, AALLC claimed a right to collect principal and interest amounts from the Plaintiff.

85. AALLC knew the interest amounts it sought to collect were not supported by contract or statute and that it had no right to collect the interest.

86. AALLC foregoing acts violated the MCDCA, at Md. Code Ann., Com. Law 14-202(8).

87. AALLC's MCDCA violation caused the Plaintiff to endure damages including heavy stress, headaches, stomach aches, sleepless nights, weigh instability, excessive worry, pecuniary expenses, mental and emotional distress, rendering AALLC liable for actual damages in an amount to be determined pursuant to MCDCA, §14-203.

### COUNT IV: MCPA INDIVIDUAL CLAIM

88. Plaintiffs incorporate paragraphs 1 - 87 by reference.

89. AALLC also violated the MCPA §13-301(13)( iii) when it violated the MCDCA at §14-202(8) by claiming a right to interest and principal that it knew was not authorized to collect.

13

90. AALLC's MCPA violation caused the Plaintiff to endure damages including heavy stress, headaches, stomach aches, sleepless nights, weigh instability, excessive worry, pecuniary expenses, mental and emotional distress

91. AALLC's conduct was the proximate cause of Plaintiff's injuries, rendering AALLC liable for actual damages in amount to be determined pursuant to the MCPA at §13-408(a), and for attorney's fees pursuant to MCPA, §13-408(b).

### COUNT IV: FCRA 15 U.S.C. §1681 INDIVIDUAL CLAIM

92. Plaintiff realleges and incorporates paragraphs 1 through 91 above as if fully set out herein.

93. Defendants Equifax, Experian and Trans Union (collectively, the CRAs) prepared and issued credit reports concerning plaintiff which included inaccurate information.

94. In 2007 some person hereinafter referred to as "imposter" used plaintiff's identity to apply for credit with Defendant Comenity and possibly other credit grantors, i.e. MidNight Velvet. Each of the CRAs provided plaintiff's credit report to Comenity in response to the imposter's credit application. Comenity opened three accounts in plaintiff's name and extended credit to the imposter.

95. Plaintiff did not become aware of this fraudulent activity until nearly a year or so later. At which time the Plaintiff notified Comenity that the accounts were the result of the imposter's theft of plaintiff's identity. Plaintiff is informed and believes that on August 28, 2008 Comenity closed the accounts with the understanding that the accounts were opened fraudulently.

14

96. Although Comenity was made aware of the fraudulent nature of the accounts, Comenity reported the debts to the CRAs and claims to have sold the fraudulent accounts to AALLC in July and August of 2010.

97. After AALLC's alleged acquisition of the fraudulent accounts, it also began reporting the accounts to the CRAs.

98. Plaintiff completed an identity theft police report and sent the reports to all defendants in December 2010 and again in early 2011.

99. Despite receiving Plaintiff's identity theft police reports the Defendants continued to report the fraudulent accounts in each respective capacities.

100. For over two years the Plaintiff notified the CRAs over and over again with dispute letters stating that he was the victim of identity theft and that the information being reported on his credit report was inaccurate.

101. The CRAs continued to report inaccurate information on plaintiff's credit reports after receiving his disputes. Upon information and belief the CRAs forwarded plaintiff's disputes to Comenity and AALLC (collectively the "Furnishers") because the CRAs investigation results stated that the Furnishers verified the information was being reported accurately.

102. Sometime during the year of 2013 the Plaintiff retained the services of a credit restoration company, who disputed the accounts with the CRAs on numerous occasions. Upon information and belief the CRAs forwarded the disputes to the Furnishers, who verified the information as being accurate on several occasions.

103. If any of the Defendants had performed an actual investigation of Plaintiff's disputes then the Defendants would have easily determined that the Plaintiff did not sign an application for the disputed accounts, the Plaintiff did not use the accounts to make any

purchases, the Plaintiff did not authorize the use of the accounts and the Plaintiff filed an identity theft (police) reports regarding the disputed accounts. Upon such determination of the foregoing the Defendants would have deleted, blocked, removed or otherwise caused the disputed accounts from appearing on the Plaintiff's credit report.

104. If the CRAs employed procedures that reasonably sought to report maximum information, it would have blocked or deleted the disputed accounts once the CRAs received credible information, i.e. police report, that the disputed accounts were created fraudulently. Additionally, the CRAs would have required the Furnishers to provide proof of the account once it received credible information that the accounts were opened fraudulently.

105. Within two years of the filing of this complaint the Defendants Equifax, Experian and Trans Union willfully and/or negligently failed to comply with the requirements of the FCRA including but not limited to:

    a. failing to follow reasonable procedures to assure maximum possible accuracy of the information in reports concerning plaintiff, as required by 15 U.S.C § 1681e(b);

    b. failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate, as required by §1681i(a); and

    c. failing to block the disputed information, as required by § 1681c-2.

106. Within two years of the filing of this complaint the Defendants Comenity and AALLC willfully and/or negligently failed to comply with the requirements of the FCRA including but not limited to:

    a. failing to fully and properly investigate the Plaintiff's disputes, as required by 15 U.S.C. §1681s-2(b)(1)(A); and

  b. failing to review all relevant information provided by the CRAs, as required by 15 U.S.C §1681s-2(b)(1)(B).

107. As a result of Defendants' failure to comply with the requirements of FCRA, plaintiff has suffered actual damages, including economic loss, lost opportunity to receive credit, damage to reputation, invasion of privacy, interference with his normal and usual activities, emotional distress, anger, frustration, humiliation, anxiety, fear, worry and related health problems, for which plaintiff seeks damages in an amount to be determined by the jury.

108. Plaintiff requests attorney fees pursuant to 15 U.S.C §1681o(a).

109. The violations by Defendants were willful, rendering Defendants liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. Punitive damages are required to change Defendants reckless disregard for the rights of consumers to obtain accuracy in their credit reports and remove erroneous data. In the alternative, Defendants were negligent, entitling the Plaintiff to recover under 15 U.S.C. §1681o.

110. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

### Demand for Jury Trial

111. Plaintiffs demand trial by jury in this action.

### Demand For Judgment for Relief

ACCORDINGLY, plaintiff respectfully request that the Court:

  a. Assume jurisdiction over all claims;

  b. Award actual damages including all excess interest paid;

c. Either award actual damages equal to all excess interest charged but not paid, or order that such interest be cancelled;

d. Award statutory damages;

e. Award punitive damages;

f. Award statutory costs and attorney fees;

g. Award $25,000 to Plaintiff as an incentive for representing the class; and

h. Provide for all other proper relief.

Respectfully submitted,
JOSEPH HOOKER

*Joseph Hooker*

Joseph Hooker
1009 Trebing Lane
Largo, MD 20774
Tel: (301) 641-9423